UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

#23-CR-10031-IT

_____

UNITED STATES

v.

NATHAN BODDIE

_____

**MEMORANDUM OF LAW AND EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION REQUESTING THE COURT TO DECLARE A CATEGORICAL POLICY DISAGREEMENT WITH THE PURITY-DRIVEN METHAMPHETAMINE GUIDELINES**

**INTRODUCTION**

Defendant Nathan Boddie ["Boddie"] has filed a motion asking this Court to join a growing number of district courts throughout the United States in declaring a categorical policy disagreement with the purity-driven methamphetamine guidelines. Boddie has chosen this vehicle, rather than simply filing an objection to the Presentence Report on such grounds, because this policy issue relates to all methamphetamine cases coming before the Court for sentencing, irrespective of any particular defendant's individual characteristics. It is also the vehicle employed in *United States v. Bean*, 371 F. Supp. 3d 46 (D.N.H 2019), where Judge McCafferty issued a lengthy decision declaring such a policy disagreement. Judge McCafferty's decision in *Bean* has been cited with approval by a number of other district courts that have addressed this issue more recently.

Such a declaration is clearly warranted on a variety of grounds. First, there is no empirical basis for the 10:1 ratio of methamphetamine mixtures to "actual" methamphetamine embodied in the guidelines. Second, any logical grounds for using the purity of methamphetamine as a proxy for a defendant's role in

the offense or proximity to the source of the drugs have vanished over time since virtually all methamphetamine illegally sold in the United States in recent years exceeds 90 percent in purity. Third, this irrational purity enhancement has the effect of treating defendants convicted of methamphetamine offenses under the guidelines far more harshly than defendants convicted of conspiring to distribute or distributing other illegal drugs, including heroin, fentanyl, and cocaine. This disparate treatment makes no sense. Fourth, the purity enhancement means that the base offense level in methamphetamine cases will vary dramatically depending on whether or not the government chooses to test the seized drugs for purity or whether that testing can be completed prior to sentencing. This results in arbitrary and capricious distinctions among similarly-situated defendants. Finally, the irrational purity enhancement for methamphetamine effectively undermines the statutory sentencing objectives set forth at 18 U.S.C. §3553(a). For all of these reasons, as explained in detailed below, the Court should declare a policy disagreement with the methamphetamine guidelines as currently written and, in lieu thereof, sentence Boddie and all subsequent methamphetamine defendants using the methamphetamine mixture guidelines, irrespective of the "purity" of the drug.

I.      **THE METHAMPHETAMINE GUIDELINES.**

The base offense level for methamphetamine offenses under the sentencing guidelines is derived from the Drug Quantity Table set forth at U.S.S.G. §2D1.1(c). Note (B) to that table directs the Court to use the offense level determined by the entire weight of a mixture containing methamphetamine or the offense level determined by the weight of actual methamphetamine or "ice," whichever is greater. Note (C) to the Drug Quantity Table defines "ice" as a mixture containing methamphetamine of at least 80% purity. The Table establishes a 10:1 ratio in its treatment of quantities of methamphetamine mixtures on one hand

and actual methamphetamine or "ice" on the other. Thus, the very same base offense level applies to a particular quantity of actual methamphetamine or ice and to ten times that quantity of a mixture containing methamphetamine.

## II. THERE IS NO EMPIRICAL BASIS FOR THE 10:1 RATIO EMBODIED IN THE METHAMPHETAMINE GUIDELINES.

It is well-settled that the Sentencing Commission departed from an empirical approach in setting the guidelines ranges for drug offenses in 1989, choosing instead to key the guidelines to the statutory minimum sentences that Congress had established for such crimes in 1988. *See, e.g., Gall v. United States*, 552 U.S. 38, 46 n. 2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). As Judge McCafferty observed in *Bean*, "many courts have noted that no empirical data appears to justify the guidelines' 10:1 ratio." 371 F. Supp. 3d at 51. *See also United States v. Ferguson,* 2018 WL 3682509 (D. MN.) (8/2/18) at *3; United States v. Hartle, 2017 WL 2608221 (D. ID.) (2/15/17) at *2 ("I have tried to determine whether there is any empirical data from the Sentencing Commission or in the academic literature which would justify the [10:1] ratio. I have found none.").

## III. THE PURITY OF METHAMPHETAMINE NO LONGER SERVES AS A RATIONAL PROXY OR INDICATOR OF A DEFENDANT'S ROLE IN THE DRUG DISTRIBUTION CHAIN OR PROXIMITY TO THE DRUG SUPPLY.

The sole rationale for using purity as a relevant variable in methamphetamine cases appears in Comment 27(C) to U.S.S.G. §2D1.1. That comment states that the purity of a controlled substance "may be relevant in the sentencing process because it is probative of the defendant's role and position in the chain of distribution. Since seized controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure

narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."

Over time, however, this premise has dissolved into nothing but a hollow pretext for ratcheting up the guidelines calculation for methamphetamine offenses. We are no longer in the "Breaking Bad" era when the seizure of pure methamphetamine was unusual.[1] Rather, "[t]oday, methamphetamine is almost always imported from foreign drug labs and the purity levels are much higher." *Hartle*, 2017 WL 2608221 at *2. According to the DEA, the average purity of methamphetamine in the United States between 2012 and 2017 was over 90%. *Bean*, 371 F. Supp. 3d at 52. *See also* Table of Drug Purity set forth in *United States v. Nawanna,* 321 F. Supp. 3d 943, 952 (N.D. IA. 2018). As one district court put it earlier this year: "The fact is – and there doesn't seem to be much disagreement on this point – that nearly all of the methamphetamine that's actually tested in relation to federal drug crimes is highly pure." *United States v. Havel*, 2023 WL 1930686 (D. NE.) (2/10/23) at *5. Thus, for at least the last decade, "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D. NM. 2017). As Judge McCafferty put it in *Bean*: "In effect, the, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true." 371 F. Supp. 3d at 53.

IV.   **THE PURITY-DRIVEN METHAMPHETAMINE GUIDELINES ARE UNDULY HARSH WHEN COMPARED TO THOSE FOR OTHER DRUG OFFENSES**.

Due to the multiplier embodied in the guidelines for "pure" or "actual" methamphetamine or "ice," now applicable to virtually every methamphetamine case, "[m]ethamphetamine offenses receive more

---

[1] Breaking Bad was a popular fictional television series set in New Mexico during the years 2008-2010 which featured a high school science teacher who became a drug kingpin by manufacturing a version of pure methamphetamine, a rare feat at the time.

severe sentences than any other drug." *Bean*, 371 F. Supp. 3d at 53. Thus, for example, 208 grams of actual methamphetamine (the quantity of the seizure in this case) triggers a base offense level of 32. That same quantity of cocaine base would trigger a base offense level of 28. That same quantity of fentanyl would trigger a base offense level of 26. That same quantity of heroin would trigger a base offense level of 24. That same quantity of cocaine would trigger a base offense level of 18. The arbitrary unfairness of these unwarranted disparities is self-evident.

## V. THE IRRATIONAL AND DRACONIAN PURITY-DRIVEN METHAMPHETAMINE GUIDELINES UNDERMINE THE STATUTORY SENTENCING OBJECTIVES EMBODIED IN 18 U.S.C. §3553(a).

The artificially-inflated guidelines for "actual" methamphetamine applicable to virtually every such case consistently yield sentences greater than necessary to achieve the purposes of §3553(a) since those guidelines treat all methamphetamine defendants like drug kingpins. *Havel*, 2023 WL 1930686 at *5. The statute specifically articulates "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct...." 18 U.S.C. §3553(a)(6). Yet the purity-driven methamphetamine guidelines direct the Court to begin its sentencing analysis with an irrational and unfair disparity between defendants convicted of methamphetamine offenses and those convicted of other drug offenses. Such a disparity should not be countenanced..

Section 3553 also instructs sentencing judges to impose a sentence "sufficient, but not greater than necessary," to effectuate its objectives. The methamphetamine guidelines, if followed, compel the Court to start the process with an artificially high sentencing range, necessitating a variance in every case to lower the sentence to a reasonable level. That is not how the process is supposed to work.

## VI. THE COURT'S AUTHORITY TO DECLARE A CATEGORICAL POLICY DISAGREEMENT WITH THE METHAMPHETAMINE GUIDELINES.

While the sentencing guidelines must serve as the "starting point and the initial benchmark" for federal sentencing, the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Accordingly, it is now well-settled that district courts may vary from the guidelines on policy grounds. *E.g. Kimbrough v. United States*, 552 U.S. 85, 105-107 (2007). In *Spears v. United States,* 555 U.S. 261, 264 (2009)(*per curiam*), the Supreme Court stated that a district court may reject a guideline on a categorical basis, "not simply based on an individualized determination that [it] yield[s] an excessive sentence in a particular case." *See also United States v. Stone*, 575 F. 3d 83, 89 (1st Cir. 2009) (reaffirming district court's authority to vary from guideline range based on a categorical policy disagreement). Indeed, as the First Circuit recognized in *Stone,* "a district court makes a procedural error when it fails to recognize its discretion to vary from the guideline range based on a categorical policy disagreement with the guideline." *Id.* There is thus no doubt that this Court has the power to do precisely what Boddie is asking it to do in this case – declare a categorical policy disagreement with the irrational, purity-driven methamphetamine guidelines.

## VII. A GROWING CHORUS OF DISTRICT COURTS THROUGHOUT THE UNITED STATES HAVE DECLARED A CATEGORICAL POLICY DISAGREEMENT WITH THE METHAMPHETAMINE GUIDELINES.

It is truly extraordinary that at least 14 district courts throughout the United States have declared a categorical policy disagreement with the purity-driven methamphetamine guidelines during just the past six years. *United States v. Celestin,* 2023 WL 2018004 (E.D. LA.) (2/15/23); *United States v. Havel,* 2023 WL 1930686 (D. NE.)(2/10/23); *United States v. Robinson,* 2022 WL 17904534 (S.D. MI.)

(12/23/22); *United States v. Carrillo,* 440 F. Supp. 3d 1148, 1157 (E.D. CA. 2020); *United States v. Moreno,* 583 F. Supp. 3d 739, 741 (W. D. VA. 2019); *United States v. Rodriguez,* 382 F. Supp. 3d 892, 893 (D. AK. 2019); *United States v. Johnson,* 379 F. Supp. 3d 1213, 1225 (M. D. AL. 2019); *United States v. Bean*, 371 F. Supp. 3d 46 (D. N.H. 2019); *United States v. Pereda*, 2019 WL 463027 (D. CO.)(2/6/19); *United States v. Nawanna*, 321 F. Supp. 3d 943 (N. D. IA. 2018); *United States v. Harry,* 313 F. Supp. 3d 969, 971-974 (N. D. IA. 2018)*; United States v. Ferguson*, 2018 WL 3682509 (D. MN.)(8/2/18); *United States v. Saldana,* (No. 17CR271-1 W.D. MI.) (7/3/18)(Court's Sentencing Memorandum appended hereto as Exhibit 1.); *United States v. Ibarra-Sandoval,* 265 F. Supp. 3d 1249, 1255-257 (D. N.M. 2017). In this District, Judge Casper took the same position in the context of sentencing the defendant in *United States v. Peter Lobo*, No. 17-10063-DJC. *See* sentencing transcript (11/29/17), pp. 22-23, appended hereto as Exhibit 2.

All of these courts employed similar reasoning and legal analysis to reach the same conclusion – that the current methamphetamine guidelines should be rejected on policy grounds and an appropriate variance should be adopted and applied in sentencing all defendants convicted of methamphetamine offenses. As Judge McCafferty put it, this is "a policy-based variance that is wholly independent of the individual defendant's unique circumstances and characteristics." 371 F. Supp. 3d at 55.

**VIII. APPLYING THE METHAMPHETAMINE MIXTURE GUIDELINES IN ALL METHAMPHETAMINE CASES IS AN APPROPRIATE VARIANCE**.

Virtually all of the courts that have rejected the current purity-driven methamphetamine guidelines have concluded that the appropriate remedy is to apply the methamphetamine mixture guidelines instead. In *Bean*, Judge McCafferty cited the Supreme Court's decision in *Spears* in rejecting a case-by-case

7

approach "that collapses [the Court's] policy disagreement into its individualized determination [of an appropriate sentence in a particular case]." 371 F. Supp. 3d at 55. Rather, she concluded, "maximum transparency" is achieved if the guidelines are recalculated using the base offense level for the methamphetamine mixture guidelines in every methamphetamine case before an individualized assessment of the defendant takes place. *Id*. The same approach (substituting the methamphetamine mixture guidelines for the purity-driven guidelines) was adopted in *Celestin*, *Havel*, *Rodriguez*, *Moreno*, *Harry, and Saldana*. In most of the other cases cited above, the sentencing court applied the methamphetamine mixture guidelines in a particular case without proclaiming that it would necessarily do so in every methamphetamine case going forward. But the effect was the same.

## CONCLUSION

This Court should add its voice to the growing chorus of district courts throughout the United States that have recognized the unfairness and irrationality of the current purity-based methamphetamine guidelines. For the reasons articulated by Judge McCafferty in *Bean* and adopted in myriad other cases, the Court should declare a categorical policy disagreement with the purity-driven methamphetamine guidelines and announce that it will employ, in lieu thereof, the methamphetamine mixture guidelines as a remedial variance in this case and all future methamphetamine cases. The Probation Office should be directed to recalculate the guidelines in this case using the methamphetamine mixture guidelines and incorporate that recalculation into its final Presentence Report prior to the September 19th sentencing hearing.

Respectfully submitted,

NATHAN BODDIE

By his attorney,

 /s/ James L. Sultan
James L. Sultan, BBO #488400
jsultan@rankin-sultan.com
Rankin & Sultan
1666 Massachusetts Avenue, Suite P-16
Lexington, MA 02420
(617) 720-0011

**CERTIFICATE OF SERVICE**

    I hereby certify that this document(s) filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 9, 2023.

                                                                                /s/ James L. Sultan
                                                                        James L. Sultan