UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>NATHAN BODDIE | Case No. 23-cr-10031-IT |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Assistant United States Attorney Alathea E. Porter, hereby respectfully submits this sentencing memorandum in connection with the sentencing of defendant Nathan Boddie (hereinafter, the "Defendant"). Pursuant to a plea agreement tendered under Rule 11(c)(1)(B), on May 19, 2023, the Defendant pled guilty to a one-count Indictment charging Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 841(b)(1)(C). *See* Plea Agreement, Dkt. No. 62 (hereinafter, the "Plea Agreement"). Pursuant to the Plea Agreement, the Defendant admitted that the offense involved at least 237 grams of 88% pure methamphetamine. *See* Plea Agreement, at 2.

As set forth herein, and for the reasons to be stated at the sentencing hearing, the government recommends that the Court sentence the Defendant to 151 months of imprisonment, followed by 36 months of supervised release, a $100 special assessment, and forfeiture as alleged in the Indictment.

## Background of the Case

The background of the case is set forth in detail in the final Pre-Sentence Report ("PSR"), prepared by the United States Probation Office ("Probation"), and is therefore not fully restated herein. PSR ¶¶ 12-29. In summary, the case involves a conspiracy among large-scale drug dealers

in the New England area.  *Id.*  Investigators in this case, became aware of the Defendant when he reached out to Denise Guyette ("Guyette") to obtain methamphetamine from her supplier, Gerardo Garza ("Garza").  PSR ¶ 15.  As set forth in the PSR, Guyette brokered a deal for a half a pound of methamphetamine (approximately 230 grams) between the Defendant and Garza.  PSR ¶¶ 13-15.  For her assistance in brokering the deal, the Defendant paid her a $200 commission.  *Id.*  Investigators seized the package sent by Garza to the Defendant, which contained approximately 237 grams of 88% pure methamphetamine.  PSR ¶ 19.

Investigators subsequently received authorization to intercept the Defendant's phone for a period of thirty days.  PSR ¶ 13.  Interceptions over the Defendant's phone indicated that he routinely supplied controlled substances, along with his girlfriend Jill Giordano ("Giordano"), and that he also attempted to assist another drug dealer in obtaining a gun.  PSR ¶¶ 21-24.

On the night the Defendant was arrested, as the police officer approached him, the Defendant attempted to swallow a bag of methamphetamine.  PSR ¶ 26.  During his arrest, law enforcement also seized a loaded ghost gun, as well as additional ammunition, and additional methamphetamine from the Defendant.  *Id*.  A little more than a day after the Defendant's arrest, law enforcement executed a search warrant at the residence of the Defendant and Giordano.  PSR ¶ 27.  During the execution of that search, investigators seized methamphetamine in multiple locations throughout the residence, as well as digital scales used to package drugs for distribution.  PSR ¶ 28.  Investigators also seized a semi-automatic handgun, ammunition, as well as firearm parts and a 3D printer, believed to be used to print ghost gun parts.  *Id.*  Additionally, investigators found various drivers licenses depicting the Defendant's photograph, but with different names and addresses, as well as a fraudulent Social Security card.  *Id.*

**Sentencing Guidelines**

The final PSR determined that the Defendant's total offense level is 31.[1] PSR ¶¶ 33-44.[2] With a criminal history score of ten, Probation determined that the Defendant falls into criminal history category ("CHC") V. PSR ¶¶ 77-79. As a result, Probation concluded that Defendant's sentencing guideline range is 168-210 months. PSR ¶ 118. The government agrees with these calculations, however, as set forth below, the government believes a downward variance is appropriate to account for a recent amendment to the USSG.

Criminal History – "Status Points" – Variance. As the Court is aware, the United States Sentencing Commission (hereinafter, the "Commission") recently adopted amendments to the USSG, however, those amendments do not go into effect until November 1, 2023. Those amendments include one change relevant to the Defendant: the criminal history "status points" (USSG § 4A1.1(d)). That amendment eliminates the two point increase, and provides for a one point increase only for defendants, such as this one, who have seven or more criminal history points. As noted by Probation in the Objections section of the PSR, under the "status points" amendment The Defendant would receive one point instead of two, which would result in a

---

[1] The Defendant filed a motion and memorandum of law asking the Court to declare a categorical policy disagreement with the purity-driven methamphetamine guidelines ("Defendant's Motion"). *See* Dkt. Nos. 90 and 91. The government will be filing a separate memorandum in opposition to Defendant's Motion, which will address those arguments in detail. This sentencing memorandum incorporates those arguments by reference. As will be set forth in the government's opposition, this Court should reject the Defendant's argument.

[2] The government notes that Probation determined that 208.7 grams of methamphetamine (actual) were attributable to the Defendant based on the 237 grams of 88% pure methamphetamine seized from the package mailed to the Defendant. The government believes this is an incorrect application of the guidelines. Note (C) of USSG § 2D1.1(c) defines "ice" as a mixture containing methamphetamine of at least 80% purity. Here, the 237 grams of methamphetamine was over 80% purity, and as such, the full amount of 237 grams should be treated as "ice" for purposes of determining the base offense level. Because, in this case, the difference of 19 grams did not change the offense level, and the government did not object to the PSR. The government raises it here only to alert the Court to this discrepancy.

3

criminal history score of nine and a CHC of IV.  Because that amendment has already been adopted by the Commission, but is not yet in effect, the government respectfully recommends a downward variance pursuant to 18 U.S.C. § 3553(a) that reflects a CHC IV, based on a criminal history score of nine.  If the Court were to adopt this downward variance, the Defendant's Total Offense Level would be 31, and he would fall into CHC IV, resulting in a GSR of 151-188 months.

<b><u>Sentencing Factors Under Section 3553(a)</u></b>

    A.    <b><u>Nature of the Offense</u></b>

Methamphetamine is a deadly and highly addictive drug that is an increasingly serious problem throughout the United States and in the District of Massachusetts.[3]  Abuse of this potent stimulant is plaguing many parts of the country, and the government has seen a significant rise in the amount of methamphetamine in the District of Massachusetts over the course of the last few years.

Recent national reports have confirmed that methamphetamine abuse is increasing dramatically.  The National Institute on Drug Abuse found that among people aged 12 or older in 2021, 0.9% (or about 2.5 million people) reported using methamphetamine within the prior 12 months.[4]  And that reflects only those who <u>*reported*</u> use.  Moreover, methamphetamine is one of the most commonly misused stimulant drugs in the world.[5]  "The consequences of methamphetamine misuse are terrible for the individual—psychologically, medically, and socially.  Using the drug can cause memory loss, aggression, psychotic behavior, damage to the

---

[3] Martha Bebinger, *"Meth Use Is Rising In Boston, Intensifying The Opioid Crisis."*
[4] *See* National Institute on Drug Abuse, *Methamphetamine Research Report*, appearing at https://nida.nih.gov/download/37620/methamphetamine-research-report.pdf?v=59d70e192be11090787a4dab7e8cd390 (last viewed July 12, 2023).
[5] *Id.*

4

cardiovascular system, malnutrition, and severe dental problems."[6]  In addition to these horrific effects on individual health, "methamphetamine misuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills."[7]

Among people aged 12 and older in 2020, an estimated 0.6% (or about 1.5 million people) had a methamphetamine use disorder in the prior 12 months.[8]  In 2022, there were 33,355 methamphetamine-related deaths nationwide.[9]  Indeed, this crisis has worsened each year since 2015.[10]

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[11]  Purity of methamphetamine has risen to nearly 100 percent.  As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal: "There is more meth on the streets today, more people are using it, and more of them are dying."[12]

In recent years, methamphetamine has become much more prevalent in the Northeast.[13]

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (last viewed June 2, 2023).

[10] *Id.*

[11] Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*") (last viewed July 13, 2023).

[12] Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere.*

[13] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/documents/2021/03/02/2020-national-drug-threat-assessment#:~:text=The%202020%20National%20Drug%20Threat%20Assessment%20%28NDTA%29%20is,laundering%20of%20proceeds%20generated%20through%20illicit%20drug%20sales., at 23 (last visited July 12, 2023) (hereinafter, "DEA 2020 Assessment"); Streck, Joanna M

Most of the methamphetamine supply is produced in Mexico and transported to the United States.[14] That is because methamphetamine produced in Mexico presents a lower cost, higher purity, and higher potency alternative.[15] Purer, cheaper methamphetamine leads to more deaths. The number of methamphetamine overdoses in Massachusetts alone increased threefold from 2018 to 2022 (growing from 70 deaths to 210).[16] In fact, "[t]he rate of all drug-related E[mergency] D[epartment] visits was highe[r] among patients residing in the Northeast[ern United States] (2,531 per 100,000 [residents])" than any other region in the nation.[17]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic. Methamphetamine has a horrific impact on its users and on the community. Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[18] The physical effects on users are well-documented, and the emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior. They also may display a number of psychotic features,

---

et al., *Injection of Methamphetamine Has Increased in Boston, Massachusetts: 5 Waves of Centers for Disease Control and Prevention State Surveillance Data*, 17.3 J. OF ADDICTION MEDICINE 349–352 (2023) (last viewed July 12, 2023).

[14] *Id.,* at 25.
[15] *Id.*, at 31.
[16] National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (last viewed June 2, 2023).
[17] Substance Abuse and Mental Health Services Administration, PEP22-07-03-002, *Findings from Drug-Related Emergency Department Visits, 2021*, https://store.samhsa.gov/sites/default/files/pep22-07-03-002.pdf, (2022), at 9 (last viewed July 12, 2023).
[18] Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use. Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

including paranoia, visual and auditory hallucinations, and delusions (for example, the sensation of insects creeping under the skin). Psychotic symptoms can sometimes last for months or years after a person has quit abusing methamphetamine, and stress has been shown to precipitate spontaneous recurrence of methamphetamine psychosis in formerly psychotic methamphetamine abusers.[19]

And, unlike opioid addiction, there are no approved drugs available for treatment of methamphetamine addiction.[20] Addicted users who choose to stop using methamphetamine may face withdrawal symptoms including severe depression, psychosis, and intense drug cravings.[21] Even methamphetamine addicts who manage to overcome their addiction "will be at risk for relapse for years and possibly for their whole lives."[22]

The PSR attributes approximately 407 grams of methamphetamine to the Defendant. PSR ¶¶ 19, 26-29, 34. Of that 407 grams, approximately 237 grams have been analyzed for purity and determined to be 88% pure methamphetamine. The evidence indicates, however, that the Defendant had previously been involved in the distribution of significant quantities of methamphetamine prior to his appearance in this investigation. PSR ¶ 15. Indeed, after learning the price that Garza charged, the Defendant sought to obtain multiple pounds of methamphetamine from Garza (through Guyette). PSR ¶¶ 15-18. Therefore, the government maintains that the drug

---

[19] National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* April 7, 2017, appearing at https://www.drugabuse.gov/publications/research-reports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (last viewed July 12, 2023).

[20] Carmen Heredia Rodriguez, *"Meth's Resurgence Spotlights Lack of Meds To Combat the Addiction,"* Kaiser Health News, January 14, 2019, appearing at https://khn.org/news/meths-resurgence-spotlights-lack-of-meds-to-combat-the-addiction/ (last viewed July 13, 2023).

[21] National Institute on Drug Abuse, *Methamphetamine DrugFacts*, May 16, 2019, appearing at https://nida.nih.gov/publications/drugfacts/methamphetamine (last viewed July 12, 2023).

[22] National Institute on Drug Abuse, *Understanding Drug Use and Addiction DrugFacts*, June 6, 2018, appearing at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last viewed July 13, 2023).

weight calculation in the PSR is a conservative attribution.

In addition to his drug trafficking, the Defendant possessed a dangerous, loaded, ghost gun, and additional ammunition. PSR ¶ 26. At the Defendant's residence, investigators found another ghost gun and gun parts, as well as ammunition and a 3D printer used to print ghost gun parts. PSR ¶ 28. In the world of drug dealing, guns and drugs commonly go hand-in-hand. *See United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014)("[T]he connection between drugs and violence is, of course, legendary."); *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (firearms are "tools of the [drug] trade"); *United States v. Hinds*, 856 F.2d 438, 443 (1st Cir. 1988) (noting "[w]e have only to read the daily newspapers or watch the news on television to recognize that narcotic dealing and guns go hand in hand"); *see also United States v. Randle*, 815 F.2d 505, 508 (8th Cir. 1987) ("Firearms are frequently possessed by narcotics dealers to protect themselves and their drugs."). As the law recognizes, it is difficult to underestimate the dangers of guns when combined with drug dealing.

### B.     **Characteristics of the Defendant**

The Defendant is a thirty-nine-year-old man with an extensive criminal record. The type and frequency of crimes committed by the Defendant demonstrate a clear disregard for his wellbeing and the wellbeing of the community. His convictions include several theft and drug possession offenses, as well as multiple convictions for breaking and entering and driving with a suspended license. PSR ¶¶ 47-76. The Defendant has a criminal history that includes the use of a fake identification card, and as noted above, during the search of the Defendant's residence, investigators seized a number of different fraudulent identification cards with the Defendant's photo. PSR ¶¶ 28, 74. On multiple occasions the Defendant violated conditions of probation, including by failing to report to his probation officer, incurring new criminal charges, and failing

to enroll in substance abuse counseling. PSR ¶¶ 53, 61, 63. These violations indicate a lack of respect for court orders. The Defendant described struggles with addiction, as well as some difficult personal events (PSR ¶¶ 96 and 109). While those struggles may in part explain his criminal history and the criminal conduct in this case, it does not excuse it. Moreover, the Defendant was selling methamphetamine in quantities well beyond that to support his own addiction, but rather as a profit making endeavor.

### C. Need for the Sentence Imposed

A significant sentence of imprisonment is warranted to deter both the Defendant himself, as well as others, from engaging in trafficking of methamphetamine and possession of unlawful firearms and ammunition, as the dangers associated with that conduct cannot be overstated. Individuals tempted to engage in drug trafficking must understand that *any* involvement with methamphetamine will have immediate and harsh consequences. A significant term of imprisonment is necessary to send a strong warning to others who might otherwise consider profiting from this deadly drug that they must resist the temptation. General deterrence warrants a significant sentence to send the message to other individuals similar to the Defendant, that drug distribution is not a gainful way of life.

Imprisonment is necessary to send a strong warning to others who might otherwise consider involvement with this dangerous drug that they must resist the temptation. The sentence recommended by the Government would send the message that continued criminal behavior will be met with serious consequences, and such a sentence will hopefully be sufficient to deter the Defendant from resuming a life of criminal activity. A significant sentence is also necessary to promote respect for the law and to provide just punishment for the offense.

## CONCLUSION

Consistent with the factors set forth in § 3553(a), and the sentencing guidelines, the Government respectfully recommends that the Court sentence the Defendant to a term of imprisonment of 151 months, followed by 36 months of supervised release, a $100 special assessment, and forfeiture as alleged in the Indictment. Such a sentence is sufficient by not greater than necessary to accomplish the goals of sentencing.

Date:   September 12, 2023                                         Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Alathea E. Porter*
Alathea E. Porter
Charles Dell'Anno
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Alathea E. Porter*
Alathea E. Porter
Assistant U.S. Attorney

Dated: September 12, 2023