UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.

NATHAN BODDIE

Case No. 23-cr-10031-IT

**<u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION REQUESTING THE
COURT TO DECLARE A CATEGORICAL POLICY DISAGREEMENT WITH THE
PURITY-DRIVEN METHAMPHETAMINE GUIDELINES</u>**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**……………………………………………………………..   **1**

    **Categorical Approach**………………………………………………   **1**

    **The Statutory and Guideline Scheme**…………………………………   **2**

    **The History of the Methamphetamine Guidelines**……………………   **3**

    **Defendant's Arguments for Rejecting the Methamphetamine Guidelines are Without Merit**………………………………………………   **7**

**CONCLUSION**………………………………………………………   **13**

# TABLE OF AUTHORITIES

**Cases**

*Kimbrough v. United States*, 552 U.S. 85 (2007) ................................................................ 1, 2, 12

*United States v. Santiago-Rivera*, 744 F.3d 229 (1st Cir. 2014) .................................................... 8

*United States v. Bean*, 371 F. Supp. 3d 46 (D.N.H. 2019) ........................................................... 7

*United States v. Bostick*, 910 F.3d 348 (7th Cir. 2018) .............................................................. 10

*United States v. Clogston*, 662 F.3d 588 (2011) ................................................................... 2, 11

*United States v. De Jesus-Torres*, 64 F.4th 33 (1st Cir. 2023) ...................................................... 1

*United States v. Diaz*, No. 11-CR-00821-2(JG), 2013 WL 322243 (E.D.N.Y. 2013) .................. 6

*United States v. Ekasala*, 596 F.3d 74 (1st Cir. 2010) ............................................................... 2

*United States v. Elkins*, 1:18-CR-79 DRL-SLC, ECF No. 132 (N.D. Ind. February 4, 2020) ....... 8

*United States v. Hecke*, 2023 WL 3244441 (N.D. Ind. May 4, 2023) .......................................... 8

*United States v. Hoover*, No. 4:17-CR-327-BLW, 2018 WL 5924500 (D. Idaho Nov. 13, 2018) ................................................................................................................................. 10

*United States v. Kaufman*, 2019 WL 3220571 (D. Me. July 17, 2019) ............................... 8, 10, 11

*United States v. Kort*, 440 Fed. App'x 678, 2011 WL 5310586 (10th Cir. 2011) ....................... 9

*United States v. Lewis*, 963 F.3d 16 (1st Cir. 2020) .................................................................. 1

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) ................................................................. 8

*United States v. Mejia*, 55 F.4th 1 (1st Cir. 2022) ..................................................................... 9

*United States v. Reyes,* 9 F.Supp.3d 1196 (D.N.M. 2014) ....................................................... 6, 8

*United States v. Rodríguez*, 527 F.3d 221 (1st Cir. 2008) ........................................................... 2

*United States v. Saldana*, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790 (W.D. Mich. July 3, 2018) ............................................................................................................................. 7

*United States v. Soto-Villar*, 40 F.4th 27 (1st Cir. 2022) ............................................................ 9

*United States v. Turner*, 93 F.3d 276 (7th Cir. 1996) ........................................................... 9-10

*United States v. Vaquerano*, No. 22-1202, 2023 WL 5604154 (1st Cir. Aug. 30, 2023) ............. 8

*United States v. Vazquez*, 187 F.3d 624, 1999 WL 529519 (1st Cir. 1999) ................................. 2

**Statutes**

18 U.S.C. § 3553 ................................................................................................................. 2, 12

21 U.S.C. § 812 ....................................................................................................................... 3

Anti-Drug Abuse Act of 1988 ................................................................................................... 4

Pub. L. No. 101-647, § 2701, 104 Stat. 4912 (1990) ................................................................... 5

Pub. L. No. 104-237, 110 Stat. 3099 (1996) ............................................................................... 6

**Other Authorities**

Federal Sentencing Guidelines Manual (1987) .......................................................................... 3

United States Sentencing Commission Methamphetamine Final Report (Nov. 1999) ......... 4, 5, 6

United States Sentencing Guidelines Amendment 125 ............................................................... 4

United States Sentencing Guidelines Amendment 370 ............................................................... 5

United States Sentencing Guidelines Amendment 395 ............................................................... 4

United States Sentencing Guidelines, Amendment 555 .............................................................. 6

USSG § 2D1.1 ............................................................................................................... 2, 3, 4, 9

## INTRODUCTION

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby respectfully submits this opposition in response to defendant Nathan Boddie's motion and accompanying memorandum of law requesting the Court to declare a categorical policy disagreement with the purity-driven methamphetamine guidelines. *See* Dkt. Nos. 90 and 91 (hereinafter collectively referred to as, the "Motion").[1] The Defendant objects as a policy matter to the Guidelines' base offense levels ("BOL") relating to methamphetamine, which attribute higher offenses levels when a mixture contains a greater amount of methamphetamine. Specifically, he requests that the Court make a general policy determination that, in *every case*, regardless of its facts, the Court will vary downward to the Guideline Sentencing Range ("GSR") applicable to mixtures containing any detectable amount of methamphetamine. For the reasons set forth herein, the Court should deny the Motion.

## Categorical Approach

As the Defendant correctly observes, under the case law of the Supreme Court and the First Circuit, this Court has the authority to disagree with a given Sentencing Guideline on policy grounds. *See United States v. Lewis*, 963 F.3d 16, 26 (1st Cir. 2020) ("district courts have discretion to vary downwardly from a sentence on the basis of a policy disagreement with the relevant guideline") (citing *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007)); *United States v. De Jesus-Torres*, 64 F.4th 33, 41 (1st Cir. 2023) (cert. petition docketed July 7, 2023). But while the *Kimbrough* Court affirmed a sentencing court's discretion to vary downward in response to policy arguments, "the mere fact that a sentencing court has the discretion to disagree

---

[1] Page references herein to specific arguments made by the Defendant, will be references to his Memorandum of Law (Dkt. No. 91).

with the guidelines on policy grounds . . . does not mean that it is required to do so." *United States v. Ekasala*, 596 F.3d 74, 76 (1st Cir. 2010); *see also United States v. Clogston*, 662 F.3d 588, 592 (2011) (observing that "the discretion to vary under *Kimbrough* is not tantamount to an obligation to do so"); *United States v. Rodríguez*, 527 F.3d 221, 231 (1st Cir. 2008) (noting that although sentencing court may consider a *Kimbrough*-related argument, it is "not obligated to deviate from the guidelines based on" that argument).  Sentencing, by its nature and because of the imperative to consider the sentencing factors under 18 U.S.C. § 3553(a), should be individually tailored to the defendant and the offense before the Court.  In this case, the Court should refuse the Defendant's invitation to undertake a wholesale rewriting of the methamphetamine sentencing guidelines, a revision that would contradict the express intent of Congress.

<u>The Statutory and Guideline Scheme</u>

The BOLs used in federal drug crimes are generally calculated using the drug quantity table in USSG § 2D1.1(c), which provides numeric levels on a graduated scale, based on the type and quantity of drugs involved.  *See United States v. Vazquez*, 187 F.3d 624, 1999 WL 529519, *1, n.1 (1st Cir. 1999) (per curiam) (explaining Sentencing Guideline's treatment of methamphetamine). For methamphetamine, the guidelines distinguish between three categories of methamphetamine: "methamphetamine," "methamphetamine (actual)," and "ice," setting out different BOLs applicable to the same quantities of each.  *See* USSG § 2D1.1 (c) n.(B).[2]  The BOLs relating to "methamphetamine" are based on the "entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG § 2D1.1(c) n.(A).  The BOLs relating to "methamphetamine (actual)" are based on "the weight of the controlled substance, itself, contained

_____

[2] The Guidelines make a similar distinction for PCP and amphetamine, providing different BOLs for "PCP" and "PCP (actual)" and "amphetamine" and "amphetamine (actual)."

in the mixture or substance." USSG § 2D1.1(c) n.(B). The BOLs relating to "ice" are based on the total weight of the mixture or substance, where at least 80% of the mixture or substance consists of methamphetamine. USSG § 2D1.1(c) n. (C). Thus, the BOL applicable in a given case depends on the chemical analysis of the drug at issue. In addition, Note (B) to the Drug Table, USSG § 2D1.1, instructs sentencing courts to "use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the ... methamphetamine (actual), *whichever is greater.*" USSG § 2D1.1(c) (n. (B)) (emphasis added).

The Guidelines' differing treatment of "methamphetamine," "methamphetamine (actual)" and "ice" is rooted in a long and consistent series of express legislative determinations. A brief recounting of this history illuminates the well-established Congressional intent and the considered – and reasonable – policy determination to punish offenses involving greater amounts of actual methamphetamine more severely.

## The History of the Methamphetamine Guidelines

Unlike the current Guidelines, the 1987 Guidelines' Drug Quantity Table did not distinguish between actual/pure methamphetamine and methamphetamine mixtures, but, in a comment, indicated that "purity of the controlled substance. . . may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution." USSG § 2D1.1 (1987) cmt. 9; Federal Sentencing Guidelines Manual (1987), Chapter Two, Offense Conduct, Part D, *https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_D.pdf* (accessed September 13, 2023).[3]

---

[3] Indeed, the initial Sentencing Guidelines, which took effect on November 1, 1987, did not separately list methamphetamine in the Drug Quantity Table in §2D1.1. Rather, methamphetamine was treated under the drug guideline application note that set forth "Drug Equivalency Tables." In these tables, methamphetamine was listed as a Schedule II stimulant, consistent with its designation under 21 U.S.C. § 812(c). *See* United States Sentencing

In 1988, for the first time, Congress established mandatory-minimum sentences for methamphetamine offenses. *See* Anti-Drug Abuse Act of 1988 (codified at 21 U.S.C. § 841(b)(1)); 1999 Final Methamphetamine Report. As it had already done for PCP, Congress set alternative mandatory minimums for the quantity of the pure controlled substance and the quantity of a mixture containing the substance. Thus, a five-year mandatory minimum was triggered by 10 grams methamphetamine or 100 grams methamphetamine mixture, while a ten-year mandatory minimum sentence was triggered by 100 grams methamphetamine or 1000 grams (one kilogram) methamphetamine mixture.[4] In conformity with Congressional intent, the United States Sentencing Commission promulgated Amendment 125, revising the Drug Quantity Table in § 2D1.1, in part, by incorporating the new statutory penalties and differentiating between the treatment of "methamphetamine" and "pure methamphetamine."[5] *See* United States Sentencing Guidelines Amendment 125, *https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1989/manual-pdf/Appendix_C.pdf* (accessed September 13, 2023). Echoing Congress's proportional approach, under this new Drug Quantity Table, ten times as much "methamphetamine" as "pure methamphetamine" was required to qualify for any given BOL. Thus, for example, an offense involving at least 100, but less than 400 grams of methamphetamine was treated identically to one involving at least 10, but less than 40 grams of "pure" (that is, actual)

Commission Methamphetamine Final Report (Nov. 1999) *https://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf* (accessed September 13, 2023) (hereinafter, "1999 Final Methamphetamine Report").

[4] Originally, the 1988 Act mistakenly set the ten-year minimum quantity of mixture at 100 grams. This error was corrected in 1990. *See* 1999 Final Methamphetamine Report.

[5] In 1991, the Sentencing Commission dropped the term "pure methamphetamine," substituting the term "Methamphetamine (actual)." This clarifying change was not intended to be substantive. *See* United States Sentencing Guidelines Amendment 395, *https://www.ussc.gov/guidelines/amendment/395* (accessed September 13, 2023).

methamphetamine – both received a BOL of 26.  In effect, this calibration of penalties at a 10-1 mixture/actual ratio treated a given quantity of a mixture or substance as equivalent of ten percent purity.

In 1990, Congress turned its attention to (what was at the time) a novel variety of methamphetamine, generally known as "ice," which typically had a crystalline appearance and a particularly high percentage of actual methamphetamine – typically over 80 percent.  *See* 1999 Final Methamphetamine Report.  Deeming this high-purity form of methamphetamine particularly dangerous, Congress sought to provide enhanced penalties (but not a new mandatory minimum) for ice trafficking.  Thus, in the 1990 Crime Control Act, Congress instructed that the Sentencing Commission amend the guidelines "for offenses involving smokable crystal methamphetamine . . . so that convictions for [such offenses] will be assigned an offense level . . . two levels above that . . . [for] other forms of methamphetamine."  Pub. L. No. 101-647, § 2701, 104 Stat. 4912 (1990); *see* 1999 Final Methamphetamine Report.  Because directly implementing the proposed two-level increase led to anomalies in the offense level structure, particularly for defendants trafficking multiple forms of methamphetamine, the Sentencing Commission essentially treated "ice" as if it were 100 percent pure methamphetamine in order to accommodate Congress's directive to treat cases involving high-purity "ice" more severely.  *See* United States Sentencing Guidelines Amendment 370,  *https://www.ussc.gov/guidelines/amendment/370* (accessed September 13, 2023).  Congress took no action to modify or reject this amendment and it went into effect on November 1, 1991.  *See* 1999 Final Methamphetamine Report.

Five years later, in the Comprehensive Methamphetamine Control Act of 1996, Congress again addressed "the rapidly growing incidence of methamphetamine abuse and the threat to public safety such abuse poses," directing the Sentencing Commission to review and amend the

Guidelines "to provide for increased penalties" for offenses involving methamphetamine. *See* Pub. L. No. 104-237, 110 Stat. 3099 (1996), *https://www.govinfo.gov/content/pkg/PLAW-104publ237/pdf/PLAW-104publ237.pdf* (accessed September 13, 2023). In response, the Sentencing Commission promulgated Amendment 555, which, among other things, reduced by half the quantity of the mixture or substance containing methamphetamine corresponding to each offense level in the Drug Quantity Table. No change, however, was at that time made in the quantities of methamphetamine (actual) or ice corresponding to the various offense levels. *See* United States Sentencing Guidelines, Amendment 555, https://www.ussc.gov/guidelines/amendment/555 (accessed September 11, 2023). Two years later, in 1998, Congress amended the statutory penalties for methamphetamine offenses by halving the amounts that triggered the respective mandatory-minimum sentences. *See* 1999 Final Methamphetamine Report. The Sentencing Commission revised the Guidelines to reflect the new, increased penalties for all types of methamphetamine.[6]

In sum, this history shows a consistent Congressional intent, followed closely by the Sentencing Commission, to treat offenses involving substances with a higher percentage of methamphetamine as creating greater dangers to the public and, thus, meriting more severe punishment. Congress has repeatedly returned to the issue of the penalties to attach to offenses involving methamphetamine and, recognizing the dangers posed by the drug, repeatedly decreased the triggering amount associated with mandatory minimum sentences. The Sentencing Guidelines in their current form track this intent and faithfully reflect Congressional concerns and priorities.

---

[6] A more detailed discussion of the legislative history and the Sentencing Commission's response to Congressional action can be found in *United States v. Reyes,* 9 F.Supp.3d 1196, 1217-26 (D.N.M. 2014) and *United States v. Diaz*, No. 11-CR-00821-2(JG), 2013 WL 322243, *3-*7 (E.D.N.Y. 2013).

None of the arguments proposed by the Defendant justify abrogating the graduated system of penalties linked to the actual quantities of methamphetamine involved in an offense and, instead, setting up a new sentencing scheme pegged to the lowest possible level of drug purity – a level which, as the Defendant himself concedes, in no way reflects current realities. *See* the Motion, at 4 (noting that, "today nearly all of the methamphetamine that's actually tested in relation to federal drug crimes is highly pure.") (internal quotation marks and citation omitted).

<u>**Defendant's Arguments for Rejecting the**</u>
<u>**Methamphetamine Guidelines are Without Merit**</u>

The Defendant suggests that the Court reject the methamphetamine sentencing guidelines in their entirety, not only in imposing sentence in this particular case, but, prospectively, in *every case* involving a methamphetamine offense that comes before this Court. He urges a blanket downward variance, regardless of the individual circumstances of a defendant or the purity of the drug involved, proposing that in every case the guidelines be calculated using those applicable to "methamphetamine," rather than those applicable to "methamphetamine (actual)," and "ice." *See* the Motion, at 8. This proposal should be rejected. While, as the Defendant correctly points out, a number of district courts have voiced their categorical policy disagreement with the methamphetamine guidelines (*see, e.g., United States v. Bean*, 371 F. Supp. 3d 46, 50-51 & n. 3 (D.N.H. 2019) (collecting cases); *United States v. Saldana*, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, at *7-*11 (W.D. Mich. July 3, 2018) (adopting a guidelines "methodology" under which all methamphetamine would be counted as methamphetamine mixtures)), the vast majority of sentences and sentencing courts have applied the methamphetamine guidelines as written and as Congress intended. Below, the government addresses the arguments offered by the Defendant in turn.

7

First, the Defendant's complaint that the methamphetamine guidelines are not based on empirical evidence misses the mark. Criminal justice is not a science and there is no objectively "correct" sentence for a given crime involving a given quantity of a given drug. Instead, "what sentence a given individual 'deserves' for committing a given crime is, inherently, subjective." *Reyes*, 9 F. Supp. 3d at 1222. As the First Circuit has frequently noted, "[t]here is rarely, if ever, a single correct sentence in any specific case. Instead, there is almost always a 'range of reasonable sentences' for any given offense." *United States v. Vaquerano*, No. 22-1202, 2023 WL 5604154, at *7 (1st Cir. Aug. 30, 2023); *see also United States v. Santiago-Rivera*, 744 F.3d 229, 234 (1st Cir. 2014); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008).

As discussed above, the history of the guidelines, both for methamphetamine and more generally, reveals that Congress uses drug quantity, which, in the case of methamphetamine is also reflected as drug purity, to set a benchmark for the appropriate sentence. *See Reyes*, 9 F.Supp.3d at 1232; *see also United States v. Elkins*, 1:18-CR-79 DRL-SLC, ECF No. 132 (N.D. Ind. February 4, 2020) ("[T]he court is not of the view that drug weight and drug purity have nothing to do with culpability, the severity of a drug offense, or its harmful impact on the public. The street places greater value on such features as weight and purity, and it does so for self-evident reasons in the drug trade. The court is not inclined to ignore these realities."); *see also United States v. Kaufman*, 2019 WL 3220571, at *3 (D. Me. July 17, 2019) ("[T]he Guidelines reflect the harsh societal harms caused by the production, distribution, and use of pure methamphetamine as well as a legislative desire to address these harms with significant penalties."); *United States v. Hecke*, 2023 WL 3244441, at *8 (N.D. Ind. May 4, 2023) (endorsing *Kaufman's* assessment of the guidelines with respect to pure methamphetamine penalties). Even if the amount of actual methamphetamine is not a perfect metric for gauging culpability, it certainly provides a reasonable metric for evaluating

8

the seriousness of the offense.  Indeed, as the First Circuit has noted, under the current statutory and Guideline scheme, "[d]rug quantity is an important integer in the sentencing calculus." *United States v. Mejia*, 55 F.4th 1, 9 (1st Cir. 2022); *see also United States v. Soto-Villar*, 40 F.4th 27, 31 (1st Cir. 2022).  And, of course, if, in a given case, there is a discrepancy between the quantity of actual methamphetamine and the defendant's culpability, the Court can craft a sentence addressing that discrepancy without, as the Defendant in this case suggests, substituting its judgment on a categorical basis for that of the legislature and Sentencing Commission.

The Defendant next mistakenly argues that the "sole rationale" for punishing offenses involving substances with higher percentages of methamphetamine derives from USSG § 2D1.1, comment 27(C), dealing with departure considerations, which states that the purity of a controlled substance "may be relevant in the sentencing process because it is probative of the defendant's role and position in the chain of distribution."  Motion, at 3.  This argument ignores the fact that the cited comment expressly states it is inapplicable to methamphetamine, which already encompasses the amount of pure methamphetamine in the guidelines themselves.  Moreover, the Defendant completely misapprehends the history and structure of the methamphetamine guidelines, ignoring the separate provision for "ice," established precisely because of Congress's express concerns about the higher purity level, and, hence, greater danger posed by this variety of the drug.  As one court has noted, "it is evident the Sentencing Commission recommends a higher offense level for 'Ice' methamphetamine, in part, because a drug of such high purity can be 'cut' with other substances for distribution in larger quantities." *United States v. Kort*, 440 Fed. App'x 678, 685, 2011 WL 5310586 (10th Cir. 2011).  This allows methamphetamine traffickers like the Defendant (and his customers) to turn a greater profit from smaller quantities of raw product, and to inflict more societal harm in the process. *See United States v. Turner*, 93 F.3d 276, 287 (7th

Cir. 1996) ("Methamphetamine, as it is produced through normal chemical processes, contains a number of impurities that can be removed through further processing.  The finished product can be cut into larger quantities for resale.  Accordingly, the sentencing scheme for methamphetamine punishes more severely the sophisticated cooks who could otherwise manipulate the Guidelines by producing smaller quantities of a more concentrated methamphetamine.") (citations and internal quotation marks omitted); *see United States v. Bostick*, 910 F.3d 348, 350-51 (7th Cir. 2018) (upholding refusal of district judge to vary sentence based on the 10:1 ratio of methamphetamine mixture to actual methamphetamine).

More fundamentally, the purity of the drug – or, put another way, the quantity of actual methamphetamine involved in the offense – is certainly a reasonable proxy for the danger of the methamphetamine.  In fact, as courts have observed, if there is a proxy problem with the methamphetamine Guidelines, it is primarily with the lowest, "methamphetamine" Guideline, which contains an implicit assumption that methamphetamine mixtures are approximately 10 percent pure.  By the Defendant's own account, none of the methamphetamine in circulation should be assumed to contain such a low purity level, and indeed in this case it was 88% pure.  *See* Motion, at 4; *see also, e.g., United States v. Hoover*, No. 4:17-CR-327-BLW, 2018 WL 5924500, *2 (D. Idaho Nov. 13, 2018) ("[P]urity levels of seized drugs in the 10% range were common until approximately 20 years ago. Realities on the ground have since changed."); *Kaufman*, 2019 WL 3220571, at *2.

Defendant also argues that the guidelines for methamphetamine are "unduly harsh" and create unwarranted sentencing disparities compared to other types of drug offenses.  *See* Motion, at 4.  This argument overlooks the reality of the dangers posed by methamphetamine – particularly of high-purity methamphetamine and the lengthy history of Congressional action targeted at this

10

problem.  The guidelines reflect the significant and growing societal harms caused by the production, distribution, and use of increasingly pure varieties of methamphetamine, as well as a legislative desire to address these harms with significant penalties.  *See Kaufman*, 2019 WL 3220571, at *3.  As discussed above, as well as in the government's sentencing memorandum, the effects of methamphetamine abuse are well-known and documented, and pure methamphetamine exacerbates these issues.  *See* Dkt. No. 106, Government's Sentencing Memorandum, at 4-8.  In light of the role that high-purity methamphetamine has played in these troubling trends, the Sentencing Commission's distinction between actual and mixed methamphetamine is justified and worthy of this Court's respect and deference.

Likewise, the Defendant provides no support for his assertion that a disparity (if it exists) between defendants sentenced based upon known purities of methamphetamine and those sentenced based upon unknown purities merits a categorical departure from the guidelines.  *See* Motion, at 2.  The Defendant suggests that "whether or not the government chooses to test the seized drugs for purity or whether that testing can be completed prior to sentencing… results in arbitrary and capricious distinctions among similarly-situated defendants."  *Id.* The Defendant, however, does not identify any recent federal case in which the government failed to test for purity and the offender reaped a windfall in being sentenced under the mixture guidelines, nor is the government aware of any such case in this District.  Even assuming the Defendant's position, a categorical departure would not actually "accomplish the appropriate goals of sentencing." *Clogston*, 662 F.3d at 592.  Rather, it would benefit drug suppliers like the Defendant and his co-conspirators—whose high-purity methamphetamine yielded both greater profit and presented greater danger to the community—by placing them on a level with methamphetamine defendants whose drugs were neither as profitable nor as dangerous.  Such a result is wholly irrational.

11

Finally, the Defendant contends that applying the current methamphetamine guidelines undermines the objectives of 18 U.S.C. § 3553(a).  In fact, the opposite is true.  The touchstone of § 3553(a) is individualized sentencing.  The categorical approach suggested by the Defendant – ignoring the guidelines as written and, without regard to actual drug purity, giving all defendants the benefit of the lowest possible guideline – would do nothing to promote equity or public safety.

By his own admission, the Defendant profited from quantities of actual methamphetamine that tested well above the guidelines' 80% purity threshold.  Now, facing an advisory GSR of 168 to 210 months, the Defendant has asked this Court to not only ignore the guidelines distinction in his individual case, but to adopt a categorical departure that would apply to every single defendant that comes before this Court to be sentenced on an offense involving methamphetamine.  To do so would fly in the face of Supreme Court and First Circuit jurisprudence advising caution with respect to categorical departures; the Sentencing Commission's policy rationale animating the distinction; and the tremendous societal costs that accompany high-purity methamphetamine.  Conversely, consideration of the guidelines range in this case more closely aligns with the Court's obligation under § 3553(a) and *Kimbrough*—that is, to "impose a sentence that is sufficient, but not greater than necessary, to accomplish the sentencing objectives.

//

//

//

//

//

//

//

12

## CONCLUSION

For these reasons, the government respectfully requests that the Court decline to categorically depart from the methamphetamine guidelines and sentence the Defendant accordingly.

Date:   September 13, 2023                    Respectfully submitted,


                                             JOSHUA S. LEVY
                                             Acting United States Attorney

                                             /s/ Alathea E. Porter
                                             Alathea E. Porter
                                             Jennifer Zacks
                                             Charles Dell'Anno
                                             Assistant U.S. Attorneys



## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                             /s/ Alathea E. Porter
                                             Alathea E. Porter
                                             Assistant U.S. Attorney

Dated: September 13, 2023

13